UNITED STATES ex rel. KOOPOWITZ v. FINLEY, Colonel, etc.

(District Court, S. D. New York. November 3, 1917.)

1. ARMY AND NAVY ☞20—SELECTIVE DRAFT ACT—PROVISIONS OF STATUTE.

Members of a local draft board have no authority to waive any of the provisions of the Selective Draft Act, or regulations made thereunder.

2. HABEAS CORPUS ☞16—SELECTIVE DRAFT ACT—LOCAL BOARD—HEARING.

Selective Draft Act May 18, 1917, § 2, declares that such draft shall be based on liability to military service of all male citizens, or male persons not alien enemies who have declared their intention to become citizens, between the ages of 21 and 30. Section 4 authorized the establishment of district boards, having authority to review the determination of local boards. Section 5 declared that all male persons between the ages of 21 and 30 shall be subject to registration. Rules and regulations promulgated by the President pursuant to section 4 declared that resident aliens who had not taken out their first papers should be exempt, upon the filing of a claim of exemption supported by an affidavit. Section 20 declared that the claim should be filed with the local board on or before the seventh day after the mailing by the local board of the notice required to be given the registrant of his having been called for service. Relator, a nondeclarant alien, registered and submitted to a physical examination, but made no claim for exemption on or before the seventh day after mailing by the local board of the notice of call to appear for physical examination. Thereafter relator claimed exemption, which was denied by the local board, which certified him for military service, and an appeal to the district board was dismissed. *Held* that, while civil courts can afford relief from orders of the administrative boards having charge of registration only for a manifest abuse of the discretion of such boards, relator was not denied a fair hearing by the local and district boards, and was properly certified for military service.

3. ARMY AND NAVY ☞20—SELECTIVE DRAFT ACT—LOCAL BOARD—HEARING.

Under such act and regulations, as nondeclarant aliens are required to register and might be subjected to draft, save for treaty obligations, the local board had jurisdiction over relator, and his failure to duly claim exemption rendered him liable for military service; it being obvious that Congress would not have required such aliens to register, had they been absolutely excluded.

4. ARMY AND NAVY ☞20—DRAFT—POWER OF CONGRESS.

Regardless of treaties, Congress has power to subject all residents of the United States to draft for army purposes, without respect to citizenship or alienage.

5. STATUTES ☞184—CONSTRUCTION.

In construing statutes, effect should, whenever possible, be given to the provisions thereof, and that construction should be placed upon the statute which will enable its general plan to be carried out.

Habeas Corpus. Application by the United States, on the relation of Joseph Koopowitz, alias Jacob Koopowitz, for a writ against John P. Finley, Colonel Infantry, D. O. L., in Charge Militia Affairs, Headquarters Eastern Department, United States Army. Writ dismissed.

Meyer Greenberg, of New York City, for relator.

Francis G. Caffey, of New York City, U. S. Atty., and Harold A. Content, of New York City, Asst. U. S. Atty., for respondent.

MAYER, District Judge. The relator is brought before the court on a writ of habeas corpus. A full statement of the facts is desirable:

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The petition of relator, who describes himself as "Joseph" Koopowitz, sets forth that he is a Russian citizen, born in Kovna, Russia, on February 10, 1888, and arrived in the United States in August, 1915; that he is a nondeclarant alien, having never filed his intention to become a citizen of the United States; that he was drafted for service in the army of the United States, and received an order on September 24, 1917, directing him to report for military service on September 29, 1917, at Camp Upton, at Yaphank in the state of New York; that he claimed exemption before the local board, and appealed to the district board for the city of New York from the decision of the local board; that his claim of exemption was based upon the fact that he was and still is a nondeclarant alien; that on October 3, 1917, he was arrested by the military authorities for not reporting for duty under the order of September 24, 1917, and is now in custody. The relator annexes a copy of his passport, purporting to show that he was a resident in South Africa for over six years prior to July 19, 1915, and that he was possessed at said time of his Russian passport. He also annexes a sheet containing his finger prints for comparison with the finger prints on the passport.

The return on behalf of the respondent alleges that relator duly registered on June 5, 1917, under the name of "Jacob" Koopowitz, pursuant to the so-called Selective Draft Act of May 18, 1917; that by reason of the residence from which relator registered he is under the jurisdiction of local board for division No. 57 of the city of New York, state of New York; that relator's red ink number is 721, and his order number is 209. It is further set forth that on August 1, 1917, the said local board duly mailed and caused to be mailed, pursuant to the regulations prescribed by the President, in accordance with the provisions of the act of May 18, 1917, to said relator, Jacob Koopowitz, a notice of call and to appear for physical examination before the said local board on August 7, 1917, and that the said notice set forth, "Any claim for exemption or discharge must be made on forms which may be procured at the office of this local board, and must be filed at the office of this local board on or before the seventh day after the date of mailing this notice," and the said notice bore on the bottom thereof the date of mailing aforesaid; that on August 7, 1917, relator appeared before the said local board and duly submitted to a physical examination, and was examined by C. H. Hall, M. D., examining physician, and was found by the board to be physically qualified for military service; that no claim for exemption or discharge was made or filed by the relator, or by any other person in respect of the relator, on or before the seventh day after the mailing by the local board of the notice of call and to appear for physical examination; that, no claim for exemption or discharge having been filed by or on behalf of the relator within the time limited by the regulations prescribed by the President, the said local board duly certified relator for military service to the district board; that on August 12, 1917, the local board caused to be mailed to relator a notification that he had thus been certified for military service to the district board; that on August 18, 1917, an appeal from the decision of the local board was filed with the district board, and on August 24, 1917, the district board

disallowed the appeal, and affirmed the decision of the local board, and held relator for military service; that on August 30, 1917, the district board certified back relator for military service to the local board; that on August 31, 1917, the local board caused to be mailed a notice, familiarly known as the "green card," notifying relator that he had been selected for military service and requesting him to hold himself in readiness to report to the local board for military service at a date subsequently to be announced; that on September 24, 1917, the local board caused to be mailed to relator a notice, familiarly known as the "red card," ordering relator to report at the local board on September 29, 1917, at 7 in the forenoon, for military service at Camp Upton; that relator failed and neglected to respond to said notice, and that on or about October 3, 1917, relator was duly arrested and turned over to the military authorities because of his failure to report for military service.

In order to have all the facts before the court, permission was given to relator to file further affidavits in support of his petition. In accordance with such permission, relator filed an affidavit, verified October 26, 1917, wherein he set forth that, when he appeared for physical examination on August 7, 1917, he stated to the members of the local board, whose names he does not know, that he was an alien, a Russian subject, and that he did not think that he was to be drafted; that he asked them whether he had anything to do in the matter, and was informed by some one sitting at the desk writing that, as long as he was an alien, he had nothing to do and that he would not be called. It will be noted that this statement, if made, came from some unidentified person. He further swears that on August 8, 1917, he spoke to a friend of his, one Stambul, and informed him that he had been told by the members of the board that he need not do anything, whereupon Stambul informed him that it was necessary for him to file a regular exemption blank, and he then went that evening to the board and asked for a blank, stating that he wished to file his claim for exemption and again was informed by a man sitting at the desk writing, who was a member of the board, "as relator is informed and verily believes," that as long as he was an alien he need not worry; that he would not be called. He further states that the next day Mr. Stambul went with him to the office of an attorney, and the attorney advised relator immediately to cause his exemption blank to be filed, and on the following day, which was August 8, 1917, he brought his exemption blank to the board, but they refused to take it from him, claiming that it was too late. He further states that he gave his name as Joseph Koopowitz, but that his name was erroneously recorded as Jacob Koopowitz. Relator submits the affidavit of Stambul in corroboration of those matters and things as to which reference is made to Stambul in relator's affidavit.

[1] In answer to the foregoing each of the three members of the local board definitely and specifically denies the statements in relator's affidavit in respect of conversation with relator. Obviously the members of the local board had no power to waive any of the provisions of the statute or of the regulations made thereunder; for, if relator as matter of law was called upon to file his claim of exemption, he was

obligated to do so in the manner prescribed by the statute and the regulations.

[2-5] Briefly stated, the question is this: Is a person who failed to claim exemption on the ground that he was a nondeclarant alien, and who now asserts (without contradiction) that he is such an alien, properly in the custody of the military authorities? Section 2 of the act of May 18, 1917, provides, among other things:

"Such draft as herein provided shall be based upon liability to military service of all male citizens, or male persons not alien enemies who have declared their intention to become citizens, between the ages of twenty-one and thirty years, both inclusive, and shall take place and be maintained under such regulations as the President may prescribe not inconsistent with the terms of this act."

Section 5 of the act provides in part as follows:

"Sec. 5. That all male persons between the ages of twenty-one and thirty, both inclusive, shall be subject to registration in accordance with regulations to be prescribed by the President; and upon proclamation by the President or other public notice given by him or by his direction stating the time and place of such registration it shall be the duty of all persons of the designated ages, except officers and enlisted men of the regular Army, the Navy, and the National Guard and Naval Militia while in the service of the United States, to present themselves for and submit to registration under the provisions of · this act; * * * and all persons so registered shall be and remain subject to draft into the forces hereby authorized, unless exempted or excused therefrom as in this Act provided."

Under section 4 of the act, Congress outlined the administrative machinery which the President was authorized "to create and establish" in order to work out the elaborate detail which this difficult problem of raising a draft army presented. By that section the President, in his discretion, was authorized to establish local boards, and the powers of such local boards, so far as here relevant, were described as follows:

"Such boards shall have power within their respective jurisdictions to hear and determine, subject to review as hereinafter provided, all questions of exemption under this act, and all questions of or claims for including or discharging individuals or classes of individuals from the selective draft, which shall be made under rules and regulations prescribed by the President." ·

Section 4 also provides:

"Such district boards shall review on appeal and affirm, modify, or reverse any decision of any local board having jurisdiction in the area in which any such district board has jurisdiction under the rules and regulations prescribed by the President. * * *

"The decisions of such district boards shall be final except that, in accordance with such rules and regulations as the President may prescribe, he may affirm, modify or reverse any such decision. * * * ·

"The President shall make rules and regulations governing the organization and procedure of such local boards and district boards, and providing for and governing appeals from such local boards to such district boards, and reviews of the decisions of any local board by the district board having jurisdiction, and determining and prescribing the several areas in which the respective local boards and district boards shall have jurisdiction, and all other rules and regulations necessary to carry out the terms and provisions of this section, and shall provide for the issuance of certificates of exemption, or partial or limited exemptions, and for a system to exclude and discharge individuals from selective draft."

The practical construction of the statute by the Executive is illustrated by section 18 of the Rules · and Regulations prescribed by the President for local and district boards, the title of said section being:

"Persons or Classes of Persons to be Exempted by a Local Board."

The section begins as follows:

"The following persons or classes of persons, if called for service by a local board and not discharged as physically deficient, shall be exempted by such local board upon a claim for exemption being made and filed by or in respect of any such person, and substantiated in the opinion of the local board, and a certificate of absolute, conditional, or temporary exemption, as the case may require, shall be issued to any such person."

Later in the section, under various subdivisions, are enumerated the persons or classes of persons to be exempted by the local boards, and in subdivision (f) it is provided:

"(f) *All Other Resident Aliens Who have Not Taken Out Their First Papers.*—Any person who is a resident alien—that is, a citizen or subject of any foreign state or nation other than Germany—who shall not have declared his intention to become a citizen of the United States, upon presentation to such local board, at any time within 10 days after the filing of a claim of exemption by or in respect of such person, of an affidavit signed by such person setting forth the following information:

"1. Date and place of birth.
"2. Date of immigration into the United States.
"3. Whether he has taken out his first papers—that is, declared his intention to become a citizen of the United States.
"4. Present address: and upon presentation by affidavits of such other evidence as may be required in the opinion of the board to substantiate the claim."

It is also provided in this same section that:

"The statement on the registration card of any such person that exemption is claimed shall not be construed or considered as the presentation of a claim for exemption."

In brief, it thus appears that a nondeclarant alien could obtain his exemption upon filing a proper claim therefor. Section 20 of the Regulations provides that such claim must be made by the claimant or by some other person in respect of the claimant on a form prepared by the Provost Marshal General and furnished by the local boards for that purpose. This section further provides:

"Such claim must be filed with the local board on or before the 7th day after the mailing by the local board of the notice required to be given such person of his having been called for service."

From the foregoing it will be seen that all the forms of law and procedure were duly and properly complied with by both the local and the district boards. Relator not having filed his claim for exemption within the prescribed period, there was nothing before the board to show that he was entitled to exemption, and as a result he was properly certified to the district board, which in turn properly disallowed relator's appeal. In the recent case of Angelus v. Sullivan, 246 Fed. 54, the court said:

"While disagreeing therefore with the opinion expressed by the district judge that the courts cannot interfere with the action of the boards and hold-

ing as we do that the civil courts can afford relief from orders made by such boards in any case where it is shown that their proceedings have been without or in excess of their jurisdiction or have been so manifestly unfair as to prevent a fair investigation, or that there has been a manifest abuse of the discretion with which they are invested under the act, we nevertheless approve the conclusion he reached that the bill should be dismissed."

In the case at bar a fair hearing was not denied to relator, and both the local and the district boards acted in strict accordance with the procedure laid down by the Regulations.

The remaining question is whether the local board wholly lacked jurisdiction. It is contended, because nondeclarant aliens are exempted from the draft, that no obligation was placed upon relator affirmatively to present his claim for exemption, and this is but another way of stating that by virtue of the act itself relator was automatically exempted. It must be conceded at the outset that Congress had the power to subject all persons to the draft, whether citizen or alien.[1]

The question, then, is whether, from the structure of the act, it was the intention of Congress that only those who claimed exemption should in proper cases be exempted or whether those entitled to exemption could disregard the procedure provided for by the act and the Regulations and show aliunde, as here, that they fell within one of the statutory exempt classes. Putting the matter another way, the question is whether the government was required under the act affirmatively to ascertain whether relator was exempt or whether the duty rested upon relator to show that he was exempt.

In answering these questions it must be remembered that the case calls for the construction of a statute, and, in construing this statute, it is important to understand the machinery erected by it and the methods and manner which it prescribes for bringing into the service of the United States those who are within the statutory draft age. It would, of course, have been easy for Congress to accept nondeclarant aliens from the registration provision of section 5. For instance, it did not include, and therefore excluded, women. It did, however, include all male persons within the draft age. The obvious purpose of this provision of section 5 was to construct a roster throughout the entire nation, which, as it were, would constitute prima facie the list from which the draft was to be made up. Section 5 made all registered persons subject to draft, "unless exempted or excused therefrom as in this act provided." There seems to be good reason, as matter of language, for using both words; that is, "exempted" and "excused." Certain persons were by the act made exempt. Thus, to illustrate: Under section 4 regularly or duly ordained ministers of religion are exempt. Under the same section, however, the President was authorized to exercise his discretion to exclude or discharge from the draft or to draft for partial military service only, certain other classes, such, for instance, as county and municipal officials. These latter classes were not entitled to exemption as matter of right, for Congress conferred upon the President the discretion of determining

[1] In stating this proposition I am not to be understood as referring in any manner to what the Legislative and Executive branches might deem to be the proper course to pursue in respect of treaty obligations, if any.

whether certain classes should be excluded, which is but another way of conferring upon the President the right to excuse these classes. By virtue of section 2 of the act above quoted, nondeclarant aliens are exempt because not included. But section 2 provides that the draft "shall take place and be maintained under such regulations as the President may prescribe not inconsistent with the terms of this act."

This, therefore, is a general declaration in the early part of the act that the draft is to take place under lawful presidential regulations and, later in the act, to wit, in section 4, Congress has provided for the general nature and character of the regulations. Certainly section 5, as to registration, so far as it included nondeclarant aliens, would have been a useless provision, if the act did not after that operate upon nondeclarant aliens, as well as upon all other classes made exempt by the statute. Whether a person is a nondeclarant alien or not is a question of fact, exactly the same as whether a person is a duly ordained minister of religion or a student for the ministry in a recognized theological or divinity school, and the clear purpose of the act was that the fact should be ascertained by the administrative boards which the President was authorized to create. Any other method would have made the act, in part at least, unworkable, and it is a familiar rule of construction of statutes that, whenever possible, effect shall be given to the provisions of a statute, and that that construction shall be placed upon it, if possible, which shall enable its general plan or scheme to be carried out. Further, it is quite plain that Congress had in mind that some of those exempted by the act might not claim exemption and might be willing to serve in accordance with the draft.

It must be further assumed that it was impossible for the local and district boards, or any other governmental agencies, independently to ascertain whether or not a relator was a nondeclarant alien; for such an inquiry would involve a search of the records of the naturalization courts, federal and state, throughout the entire country, to ascertain a negative, to wit, whether a person had not declared his intention— an obvious impossible and absurd inquiry. The whole plan of the act is undoubtedly to require that those who claim exemption shall affirmatively present their claim to the appropriate body, so that that body can determine as a fact whether the person falls within the exempted classes. When, therefore, no such claim is presented, and the proceedings of the local and the district boards are regular in every respect, the court cannot go outside of the proceedings of the boards to determine independently something which the act required should be determined by these boards. It is, of course, not strange that some who would have been entitled to exemption have failed to claim exemption; but the remedy, if any, in such case, does not lie with the courts.

For the foregoing reasons the writ is dismissed.